## ATLANTA, AUGUST TERM, 1860. 167

Aaron *alias* Bryant vs. The State of Georgia.

# AARON *alias* BRYANT *vs* THE STATE OF GEORGIA.

1. When the verdict of the jury is strongly and decidedly against the weight of evidence in a criminal case. the Court will order a new trial.
2. It is justifiable homicide to kill one who intends, by violence, to commit a felony upon the person of another.
3. When the circumstances are such as to excite the fears of a reasonable man, in the absence of all other proof to the contrary, the law will attribute the killing to these fears, and not to revenge or passion.
4. When a homicide is committed with a deadly weapon, and the slayer is indicted for murder, it is competent for him to prove that he came by the weapon accidentally, or for an innocent purpose, on the occasion.

Indictment for Murder, in Newton Superior Court. Tried before Judge CABANISS, at the March Term, 1860.

At the September Term, 1859, of the Superior Court of Newton county, a bill of indictment was found true by the grand jury, charging and accusing Richard Aaron, otherwise called Richard Bryant, with the murder of James H. Reynolds.

On the trial of said case the following testimony was introduced in behalf of the Commonwealth, to wit:

BURRELL BORDERS, sworn: Witness was at James Reynolds', on the 22d of August, in the year 1859. James Reynolds lived in Newton county. Witness went to Reynolds', and he, Reyonlds, was sitting on the fence, and Richard Aaron, James Aaron, John Aaron, and William Lawson, came out of the woods to where we were sitting; they proposed a game of marbles. Richard Aaron said he could take his partner and beat any other two, for a quart of brandy. John Aaron said he would take the bet, if he could get a partner. John Aaron asked witness to play with him, and also William Pennington, but we refused. He then asked James Reynolds, and told him if he lost he would pay for the brandy. Reynolds said he would play for accommodation, but would have nothing to do with the bet. John Aaron said he would pay for the brandy if they lost it. They then entered into the game; John Aaron and James Reynolds beat the first game. They proposed another game but the boys refused, and James Aaron said he would give

**EXCUSABLE AND JUSTIFIABLE HOMICIDE, DISTINCTION BETWEEN, ABOLISHED.** "As the effect of a homicide se defendo and se et sua defendo was in law the same, **the statute, while preserving the distinction as to the facts** which would justify the one and excuse the other, **abolished the common-law classification of excusable and justifiable homicide.** This doctrine is not a new one in our criminal jurisprudence, but one well known, and it may be that unnecessary reference is here made to the history of the two sections of our Code. The

them two in five to play. They then engaged in a second game, and James Reynolds was getting ahead; John Aaron throwed his marble up near the ring, when his time came to shoot; his marble flew back and hit his hand; he said he said "vence," but James Aaron said that he said "kicks;" then they got to disputing about it. James Aaron walked up and stepped into the ring, and swore he (John) should not shoot. James Aaron gave John Aaron the damn lie. John Aaron then struck him, or struck at him, witness does not know which. Watters and deceased took hold of James Aaron, and prisoner took hold of John Aaron. John Aaron told prisoner to let him loose, if you don't I will cut you loose. Richard Aaron pulled him two or three paces and turned him loose, and shoved him from him. Richard Aaron then walked back a rod or two, and placed his hand in his pantaloons pocket. John Aaron and James Aaron seemed as if they wanted to get together again. Deceased caught John Aaron and pulled him back some five or six feet; he then turned him loose and stepped off three or four steps; everything was silent for a moment. Richard Aaron drew his pistol out by his right, and placed it in his left hand, and fired. At the firing of the pistol deceased hollooed, I am a dead man! I am a dead man! Deceased passed by Watters and said, Oh! Andrew, I am a dead man! As soon as witness saw he was shot he started to him, but could not get to him. Deceased tried to prevent his falling to the ground. Witness and deceased's wife both got to him at the same time. Deceased said to his wife, I am dead, I do hate to die so bad. Witness don't think deceased lived more than five minutes from the time he was shot. This transaction occurred in Newton county. Richard Aaron and John Aaron are half-brothers. The parties were a west course from the house, about 40 yards from the house. James Aaron and Richard Aaron were about 4 or 5 yards apart. John Aaron was from deceased five or six feet; the parties were in a position of a triangle. John Aaron was with his side to Richard Aaron; was not looking at him at the time the pistol fired. Deceased was some farther off from Richard—he was some ten yards from him. Prisoner went off to the woods as soon as the pistol fired. James Aaron went with him; John came back to where deceased was, for Watters to go to prisoner. Deceased was wounded in the left breast, just below the collar-

distinction has time and again been recognized and applied by this court (see Monroe *v.* The State, 5 Ga. 85; Haynes *v.* The State, 17 Ga. 465; Keener *v.* The State, 18 Ga. 194; Aaron alias Bryant *v.* The State, 31 Ga. 167; Pound *v.* The State, 43 Ga. 88; Killen *v.* The State, 50 Ga. 230; Johnson *v.* The State, 72 Ga. 694; Crawford *v.* The State, 90 Ga. 701), and would not be referred to at this length, were it not that we have a certain class of cases where the distinction is not drawn, and.

Aaron *alias* Bryant vs. The State of Georgia.

bone. Witness examined the wound; the ball was a large size for a pistol, and passed through the body to the skin of the back; the wound bled, and was spurting out blood when deceased died. The pistol was held somewhat straight out from the body.

*Cross-examined.*—The marble ring was three or four panels above the gate; the pistol was a small-sized one, not more than four inches long. Witness saw the pistol. If witness said to William Aaron a day or two after the transaction, in a conversation near his house, that he did not see any one with a pistol that day, he does not recollect it. Witness does not remember how long after the shooting before the coroner's inquest was held. If witness swore before the inquest that he saw a pistol, he does not recollect it, if the question was asked he does not recollect. Witness swore upon that occasion that he heard the report of a pistol or a gun. Witness don't think he said he thought that the shot was fired from a weapon in the hands of Richard Aaron. Witness was looking at all three of the men when the pistol was fired. Witness did not tell W. Aaron, in a conversation that occurred near his house a day or two after the shooting, that the boys were on the spot when he got there. Witness thinks he told W. Aaron, in the same conversation, James Reynolds took hold of John Aaron. The left hand of prisoner is about four inches across the palm. Witness never had seen Richard or John Aaron either, before that day. Witness was so excited he might have made a mistake before the coroner's inquest. The accident happened near sundown; the inquest was not held until night; does not know what time in the night the inquest was held. Witness had been on the fence a half hour or more before the accident happened. Witness heard no words of unkindness until John and James fell out about vence and kicks; all seemed perfectly friendly, so far as he knew. When John and James fell out, deceased took hold of James and prisoner took hold of John. Witness did not see John Aaron turn round towards Dick. *Richard Aaron seemed anxious to quell the difficulty.* When Dick let John loose, he went backwards from John; at the time Richard Aaron let John Aaron loose, deceased let James Aaron loose, and approached towards John Aaron. John Aaron turned towards Dick, with his knife about half open; the pistol did fire 'at the

which, if followed, would seem to be in conflict with the principle announced in the above cases, as well as the ruling in this. As examples see Hinch *v.* The State, 25 Ga. 699; Stiles *v.* The State, 57 Ga. 183; Wilson *v.* The State, 69 Ga. 224; Heard *v.* The State, 70 Ga. 597; Darby *v.* The State, 79 Ga. 63; Jackson *v.* The State, 91 Ga. 271." Powell *v.* The State, 101 Ga. 24.

time deceased approached John Aaron. Witness did not tell Wm. Aaron in the conversation above referred to near his own house, a day or two after the accident, that James Reynolds said Dick you have shot me, and Dick replied, Jim if I have it was an accident, for I have nothing against you. They had the brandy at the mouth of the lane, about 75 yards from the house. Witness and deceased were brothers-in-law. Witness did not testify at this examination that the boys came up out of the woods, immediately proposed a game of marbles, but after they had been there half an hour they came by.

*Rebuttal.*—Witness' position was about ten feet from John and Richard Aaron, was on a line with John and W. Deceased was off to the right. Witness was not excited until after the shooting, and was still on the fence until after the shooting. Witness was sitting so he could see all parties clearly and distinctly. There was no conversation between deceased and prisoner after the accident at all. Witness did not see prisoner after the accident.

*Sur-Rebuttal.*—Before the accident they were all talking friendly, John Aaron was standing between Dick and Jim Aaron.

HOWELL P. REYNOLDS, sworn.—Witness' father was named James Henry Reynolds. On the 22d August last I was at home. Mr. Watters, Border, W. Pennington, W. Lawson, John, James, and Richard Aaron were there. There was a game of marbles played that day there. When Mr. Borders came up, John, James and Dick Aaron, and Mr. Horton came up from the woods. Dick Aaron said he could take his partner and beat any other two for a quart of brandy. John asked Mr. Borders if he could play, and he (Borders) said he could not; he asked Mr. Pennington, and he said he could not play; he asked deceased, and told him that if he played he should pay nothing of it, for he would pay it all. Deceased said, now boys, I am not going to pay for any of the brandy. They played two games, deceased and John were beat, and they paid the brandy. They started off and came back and played another game, five-up. Before they got done John dropped his marble close to the ring, and when John shot, his marble hit his fingers, and John said vence. James said he never said it. James said he would die before he should shoot his marble, and John said he would die be-

fore he would kicks it. Then Jim told John he was a damn liar, and John struck at him, and deceased stepped in between them to part them. He caught hold of Jim to hold him, and Dick Aaron caught John right round the waist and pulled him down in the woods a piece. Deceased and Watters held Jim. John told Dick if he did not let him loose he would cut him, God damn him. Dick shoved John off as he let him loose, and John went off two or three steps, and got his knife almost half open, and started after prisoner; deceased caught him and turned him half round. John started towards Dick; prisoner stepped backwards on a rock, deceased stepped to him, John Aaron, and turned him sorter round. They were all standing still, and Richard Aaron ran his hand in his pocket and pulled out his pistol, and held it in both hands to one side and fired. Deceased said now you have killed me. Dick went off to the woods, and witness saw no more of him. John was trying to get to Dick; he turned the pistol in his left hand, with the right one in the direction of deceased. Witness says prisoner is the man who killed his father. At the time of the firing all were standing still; as soon as the pistol fired prisoner ran off, and left his coat, and Jim Aaron carried it to him, and that is all.

*Cross-examined.*—Witness is in his thirteenth year. Uncle Borders was sitting on the fence; the boys had been there all day. Deceased went to the store, and the boys came back, and some of them ate dinner there. Deceased and all of them were very friendly. When deceased was shot he did not hear prisoner say I am sorry I shot you, for I have not got anything against you. Deceased was not standing close to John. John started towards Dick, and deceased caught hold of him and turned him sorter round. Prisoner never said, as witness heard, "John, don't rush on me with that knife." Witness was not looking at either particularly, but was a little agitated. Dick and John were looking at each other. Dick pulled out his pistol, and held it to one side. The pistol fired in his hand. Immediately upon the pistol firing deceased said, you have shot me. Witness looked at him, and ran up to him, and noticed nothing else. Witness stayed with his father until they carried him into the house, and all the others went off except Horton and Borders.

*Rebuttal.*—The crowd did not stay there all day; Dick

did not take dinner there. Witness saw Dick turn and run off; it was the last he saw of him. John was standing sideways to Dick when the pistol fired. The ground sloped, and Dick was down on the lower side. John and James Aaron ate dinner.

The evidence for the State closed, and defendant introduced the following testimony, viz. :

### Evidence for the Defence.

' WILLIAM PENNINGTON, sworn : He was present at the time of the difficulty, at James Reynolds', in the month of August; it was August 21st. There was a good many of us boys there; they got up a game of marbles. John Aaron and James Reynolds were partners against Dick and James Aaron; they played several games, and concluded to play one game more, five-up. They played until the game was four and four; and in playing the fifth game John Aaron shot and knocked a man out of the ring, and his taw bounced back and struck his hand. James said kicks; John said he should not kicks it at all; James said he should kicks it. At that time James stepped into the ring between John and the men, and said he should not shoot unless he kicked his taw. John said he would not kick it an inch; at this time James Aaron picked the marbles up out of the ring. John Aaron said, this may cost you a damn sight more than this. James Aaron said, it may cost you something, too. At that time the lie was passed between James Aaron and John Aaron once or twice, but witness does not recollect the exact words. James Reynolds was sitting on the fence, and jumped down, as it appeared that John and James were going together. Deceased caught hold of James, pulling him off from the ring towards the fence, and prisoner caught hold of John. John Aaron told prisoner to let him loose. Prisoner held John round the body, and was behind him. John told prisoner the second time, God damn you let me loose. At that time prisoner shoved him from him. John Aaron drew a small white handle knife; as he drew from his pocket, opened and turned his face toward prisoner, he advanced towards him, with his knife open in his hand. John Aaron advanced towards prisoner at the same time. Deceased seeing John Aaron, made as though he was trying to get between prisoner and John, passing to the right of John

Aaron about three feet. Prisoner drew a pistol from his pants pocket; as he drew it from his pocket with his right hand and let it fall into his left, it fired. In a short space of time after the pistol fired, deceased turned round and said, I am a dead man. Deceased advanced but a few steps towards his own door, his wife met him, and he dropped down and died. Prisoner drew his pistol from his pocket with his right hand, and let it fall across the palm of his left, and it fired. Prisoner's thumb of his right hand was on the hammer. Prisoner held the pistol laid across the left, with the thumb of his right hand on the hammer. From the position of his eyes, prisoner was looking at John Aaron. Witness did not hear prisoner say anything to John as he was advancing towards him with his knife. All of us met a while before dinner, at Webb's Store, and went from there to the house of the deceased. All were perfectly friendly, as far as witness saw. John Aaron, James Aaron, and Thomas Lawson, ate dinner at the house of deceased.

*Cross-examined:* Prisoner went to mill and carried grain that day. It was after dinner when they commenced playing marbles. Prisoner pulled John some three feet, but did not get to where taw was. Deceased pulled James almost five or six feet in an opposite direction from prisoner and John. Prisoner shoved John up the hill when he had turned him loose; he shoved him very close to the ring. Prisoner stepped some several steps back when he pushed John from him. John was up near by the ring, and prisoner was near at taw when the pistol fired. Deceased was not nearer than three feet to the right of John when the pistol fired. Prisoner and John were some eight or ten feet apart when the pistol fired. John's face was towards prisoner when the pistol fired. Witness was looking at prisoner when the pistol fired. Witness was looking at prisoner's eyes and face when the pistol fired. Witness was standing to the right of the ring when the pistol fired, some ten or twelve feet. John's side was towards witness. Prisoner was standing so witness could see his face. Deceased was standing near the fence, but was not sitting on the fence. Witness saw prisoner from the knees up, when he was looking at him at the time of the firing. Witness would have corrected his statement about the fence at the time if he had had time.

ANDREW J. WATTERS, sworn: Witness was present when

the unfortunate affair happened at the house of deceased; found the party at the house of deceased about an hour by sun that evening; they were playing marbles when witness got there. James Aaron and prisoner were partners against John Aaron and deceased. They were playing for a quart of brandy and half a dollar. John Aaron was betting brandy; deceased was not himself betting. They finished that game, and commenced another for the same amount. They were playing three-up. After they got through playing the second game they stopped for a while, and commenced another in which the dispute arose. The dispute was between John and James about a shoot John made, his marble bouncing back and striking his fingers. James said he told John to kicks first. John said he said vence first. James Aaron stepped into the ring to keep John from shooting unless he kicked his marble. Witness' brother spoke to them and said he would pay the quart of brandy, rather than see them have a difficulty. Witness spoke to James and told him to get out of the ring and let John shoot, and he said he would die first. Witness then told John to kicks one foot and a half, and he said he would be damned if he kicked it an inch. James then picked up the marbles out of the ring. John straightened up; prisoner was standing off towards taw from the ring, some two feet. John Aaron, when he got up, said to James, it will cost you both a damned sight more than it is worth. James said, by God it may cost you something, too. John then said something, but witness did not understand him, and James called him a damn liar. As he gave him the dam lie, John struck at him, and deceased shoved them apart. Deceased kept hold of James after he had parted them, and prisoner went up to John's back and caught him around the arms. James Aaron and deceased stayed close to where the ring was. Prisoner and John shuffled off below, a little piece towards taw mark. John told prisoner to turn him loose, God damn you turn me loose, if you don't I will cut you loose; and witness thought he was trying to get a pistol out, at the time he told him he would cut him. Prisoner turned him loose, and shoved him off from him, and John drew out a knife. Witness got off the fence and went to where deceased and James Aaron were standing. John Aaron was right opposite to where we were, and turned facing of us.

Witness thought that he was coming at James, but instead of that he turned short around and broke at prisoner, with his knife raised in a striking position, in his right hand. Prisoner commenced backing as John ran towards him, and drew his pistol, and it fired instantly. Prisoner caught the pistol in both hands as he drew it out of his pocket, and it fired. Deceased was three or four feet to the right of John when the pistol fired. John came to a halt and stood firm a few seconds; he then started towards prisoner and said, God damn you, you had better shoot again. About the time he made this remark deceased said, O, I am dead. Deceased turned and run to witness and said, Andrew, I am dead, send for a doctor. He passed by witness, and met his wife near the gate and said, O, I am dead, I am dead, and sunk down at her feet; while he was falling he said, Oh! I hate to die so bad. When witness turned around prisoner was gone, but witness does not know when, or which way he went. Deceased was stretched out on the ground, and he died directly. Prisoner pulled the pistol out with his right hand, and threw it across his left, with the thumb of his right hand on the hammer. It was not directed to any one. There was no words of difficulty between deceased and prisoner. They were all enjoying themselves while witness was there; they were all friendly. Prisoner was looking at John when the pistol fired.

*Cross-examined:* Prisoner and John were some eight or ten feet apart at the time of the firing. Deceased and prisoner were about the same distance apart. The pistol was not a self-cocking one, but was a Colt's Repeater of the latest pattern. John Aaron and James Aaron went with witness to where prisoner was that evening; witness' brother was also with him when he went.

*Rebuttal.*—Witness saw prisoner that evening about five minutes after the occurrence. When witness got to prisoner he was about one hundred and fifty yards from the house, in the road. Prisoner sent James Aaron after witness; witness met Pennington coming back. When witness got to where prisoner was, he appeared very much excited. Pistol shown in Court is the same pistol, or one like it. John Aaron remained with deceased until witness went to where prisoner was, and then went with witness down to where Dick and John Aaron were. Was nearest to prisoner when the pistol fired.

JOHN L. AARON, sworn: Witness was at the house of deceased when this unfortunate affair happened. Met deceased about 10 o'clock at Newton Factory, at the store, that morning. Pennington and Major Floyd were there. James Aaron and prisoner were with witness. Stayed at the factory about one and a half, or two hours. When we left the store, we went to Major Floyd's buggy to get a drink of rum; but prisoner said he could not drink rum, he wanted brandy. Deceased went there with us. Jim said he had rather have his dinner than anything else—that he would give a half dollar for his dinner—witness said the same. Wm. Lawson said he would get our dinner for half dollar. Deceased said if we would go home with him he would have a chicken killed and fried, or cooked any way we wanted it. Witness and prisoner, and James Aaron and deceased, all went there together. Wm. Lawson and Pennington came on behind us. When we got there we bought a quart of brandy and drank that, and deceased went to the house and had a chicken killed. He came back and said dinner was ready. He, witness, and Thomas Lawson went to dinner; they then came back down there, and knocked about the fence there until the sun was about two hours high; then got up a game of marbles, and played some three or four games; we were playing for a quart of brandy. In that time the sun was nearly down, and we all had started home. Deceased called to witness and said, if they will give us one in five we will play for another quart; and witness asked if he would go his halves, and he said he would; and then we all came back and went to playing, and played on until the game got four and four, and witness rolled up on one side of the ring, and brother Jim rolled up on the other. Witness made a shot and his marble struck his hand. Witness said vence, and Jim said kicks; witness said he said vence first, and Jim said he said kicks first, and we got to quarreling about it. James came and got right in the ring and would not let witness shoot, and then picked up the marbles, and witness said, it would cost you and prisoner more than it is worth, and he said it will cost you something, too. Witness then said something to him, but does not now recollect what, and James gave witness the damn lie, and witness struck at him. Deceased ran up and caught hold of Jim, and prisoner ran and caught hold of witness. Witness told prisoner to turn

him loose, and he held on to witness, and witness said again, turn me loose; witness said, if you don't turn me loose I will cut you loose, and prisoner saw that witness was trying to get out his knife, and he shoved witness off from him. Prisoner had witness around both arms. Witness pulled out a little white handle knife, opened it, and started back towards prisoner. Deceased saw that witness was going to prisoner, turned James Aaron loose, and came toward witness to catch him (witness). Prisoner kept backing, and drew out a pistol, and held it in both hands, and it fired. Deceased was about three feet to the right of witness. Deceased said, Dick, you have shot me; and prisoner said, Jim, I would not have shot you for the world, for I have never had a harm word against you. Gentlemen, you know I did it accidentally. Then deceased turned round and said, O, I am dead, I am dead, I am dead. Prisoner and deceased were friendly all day; just as friendly as witness and prisoner were. Defendant proposed to prove why it was he happened to have the pistol on that occasion. State objected. Court sustained the objection, and defendant excepted, and now assigns the same as error.

*Cross-examined:* Witness is half-brother of prisoner. Prisoner was about seven or eight feet from the ring when the pistol fired. Witness was about four feet from the ring, to the left of it. Prisoner was seven or eight feet from the ring. Deceased was about seven or eight feet from prisoner. Deceased was about three feet to his right, coming to catch him from getting to prisoner. Witness was advancing upon prisoner, and at that time deceased had hold of James. Witness did see the deceased and James at the time he was advancing upon prisoner. Witness don't know that deceased had hold of Jim. Deceased was to the right of witness, and not to his back. Witness never saw deceased at the time the pistol fired. Witness don't know whether deceased was advancing to stop him or not. At the time the pistol fired witness was looking at prisoner, but turned and saw deceased coming to his right; and witness had to turn around to get at prisoner. Witness had stopped when he turned round and saw deceased, and then witness advanced about one foot before the pistol fired. After he stopped, witness said to prisoner, you had better shoot again, but did not swear. Witness stopped when the pistol fired. The first thing de-

ceased said after he was shot was, Dick, you have shot me. Dick spoke so he supposed they could all hear him; prisoner said, Jim, I am sorry I did it, I would not have done it for the whole world. Gentlemen, you know I did it accidentally. Prisoner spoke loud enough, as witness supposes, for all to hear him. Immediately after the firing prisoner walked off fifty or one hundred yards. Witness remained with deceased until he died. All except prisoner and Thomas Yancy stayed upon the ground until he died. Don't know whether Jim stayed or not. Borders was sitting on the fence when the difficulty commenced. When prisoner pushed witness off, Jim was about five feet off. Prisoner, Jim and witness all left the ground together that evening. Prisoner kept out of the way of the officers.

*Rebuttal.*—Immediately after the firing, prisoner left, because some one told him to leave. When the pistol fired, prisoner was looking at witness.

*Sur-Rebuttal.*—Don't know that any one advised prisoner to leave.

W. H. AARON, sworn: Witness had a conversation with Burrell Borders near his house, two or three days after the transaction. Borders told witness then and there that he, Borders, did not see any pistol, at the time of the difficulty, in the hands of any one, but heard the report. He said that deceased said, you have shot me. and that prisoner said, Jim, if I have, it was an accident, for I have nothing against you. This is what he said, according to the recollection of witness.

*Cross-examined:* Witness is uncle to prisoner, and has been assisting the defence on the present trial. Witness had talked about the trial among the Aarons a good deal; have talked with all the witnesses, that have sworn, except Howell Reynolds. Don't recollect what day the occurrence took place, or what day witness talked with Borders; thinks it was two or three days afterwards.

JAMES HORTON, sworn: Witness was there at the time deceased was killed, and heard the commencement of the quarrel between John and Jim Aaron; prisoner took hold of John, deceased took hold of James; they got to disputing about the game of marbles; James put his foot in the ring and said John should not shoot; John said he would be damned if he didn't shoot; other remarks were made, which witness did

## ATLANTA, AUGUST TERM, 1860.   179

Aaron *alias* Bryant vs. The State of Georgia.

not distinctly hear; the damn lie was passed, John A. made an attempt to strike James, prisoner caught John A. right around the arms, and deceased caught James and kept him on the other side of the ring, John said to prisoner if you don't let me loose, I will cut you loose, and made two or three attempts and got his knife out, prisoner then turned John loose, and shoved him up the hill; John was going towards prisoner with his knife drawn, and prisoner backed down the hill and drew his pistol. John was going towards prisoner, deceased let James loose and went directly across to where John was; deceased did not get in reach of John before prisoner drew his pistol out of his pocket and held it in his right hand, thrown across the palm of the left, and it fired; deceased turned and walked some two feet towards Watters and said: Andrew, I am dead, I am dead; Mrs. Reynolds had got out, and they embraced each other, and deceased said: oh, honey, I am dead, how I hate to die; witness was looking at the parties; prisoner's thumb, he supposed, to be on the cock of the pistol; they were all friendly that day, so far as witness saw.

*Cross-examined:* Prisoner and deceased were some six or eight feet apart, John was something like sideways to him; James A. was some fifteen or twenty feet from prisoner, deceased passed across in a fast walk or run; prisoner and John were some eight or ten feet apart when John drew his knife; John had not stopped when the pistol fired; witness was sitting on the fence when the pistol fired; don't know that the difficulty between them was a sham; never said boys let them alone, they are in the habit of doing so; as soon as the firing took place, deceased turned round up the hill; witness heard all that was said and stated all he heard; something might have been said that witness did not hear, but witness thinks he heard most of the conversation; he is some relation to the deceased; defendant offered to prove why it was he had the pistol on this occasion, to rebut the presumption of any preparation for crime and of malice; State objected; Court sustained the objection, and defendant excepted, and now assigns the same as error. Pistol in evidence. Here the defence closed. After the charge of the Court jury retired and returned a verdict, finding defendant guilty of voluntary manslaughter.

We agree that the foregoing is a correct and substantial

copy of the evidence in the case adduced on the trial, March 29, 1860.

GEO. T. BARTLETT, ⎫
JOHN J. FLOYD,      ⎬ Defendant's attorneys.
                               ⎭
A. G. HAMMOND, Solicitor-General.

After reading all the sections of the Penal Code applicable to the case, the Court, among other things, charged the jury that, before they could find the defendant guilty of murder, they must be satisfied, by the proof, that he was actuated by malice expressed or implied: there can be no murder without malice. The characteristic distinction between murder and manslaughter is the want of malice in one case, and its existence in the other. But every homicide is presumed to be malicious until the contrary is shown, so that any homicide will, in legal contemplation, amount to murder, unless it be excusable on the ground of accident, or because done in self-defence, or alleviated into manslaughter by concomitant circumstances; and whether it was committed wilfully and maliciously, or under circumstances justifying or excusing it, or alleviating it, and reducing it to manslaughter, are questions for the consideration and determination of the jury, and to be determined from the evidence before them. You will, then, look to the testimony to satisfy yourselves whether the defendant was or was not actuated by malice in killing the deceased. Malice, in legal contemplation, means doing a wrongful act intentionally and without sufficient cause or excuse. If you believe that the defendant intentionally and maliciously killed the deceased, he is guilty of murder, and you should so find. If he intended to kill John Aaron, and the circumstances proven are such as to show that it would have been murder if he had killed him, and in attempting to kill him he killed Reynolds, then he is guilty of murder, and you should so find. But if he did not intend to kill Reynolds but John Aaron, and if it would not have been murder had he killed him, then his killing the deceased is not murder; and if you come to that conclusion, you will next inquire whether the facts in proof show it to be a case of manslaughter, either voluntary or involuntary. In this branch of the case, the question for you to consider and determine is: would the defendant have been guilty of manslaughter had he killed John Aaron? If John Aaron was attempting to commit a serious

personal injury upon the defendant, and the defendant, under a sudden, violent impulse of passion, had killed him, the killing in such a case would have been voluntary manslaughter; and if, under such circumstances, he killed Reynolds instead of John Aaron—if the shot was intended for John Aaron—then the killing of Reynolds was voluntary manslaughter, and you should so find. But if the killing was without any intention to do so, but in the commission of an unlawful act or a lawful act, which might produce such a consequence in an unlawful manner, in such case the offence is involuntary manslaughter. There are two kinds of involuntary manslaughter; and if you believe, from the testimony, that the defendant killed the deceased without any intention to do so, but in the commission of an unlawful act, which might produce such a consequence in an unlawful manner, then you should find him guilty of involuntary manslaughter—one in the commission of an unlawful act, and the other in the commission of a lawful act, without due caution and circumspection. If there was no intention to kill, but the killing was the result of an unlawful act, that is involuntary manslaughter; or if the killing was the result of a lawful act, in which the necessary discretion and caution were not observed, that is also involuntary manslaughter. But if John Aaron intended, or was endeavoring, by violence, to commit a felony on the person of the defendant, and if the defendant had killed him in self-defence, and in defence of his person, he would have been justifiable in so killing John Aaron; and if the shot was intended for him, and hit and killed Reynolds, in that case it is excusable homicide, and you should find the defendant not guilty; and if the killing was by accident, and not the result of evil design or intention, culpable neglect, then the law says, he shall not be found guilty of any crime; and in that case you should acquit him. There must be a felonious intent in the defendant before you can find him guilty of the crime of either murder or manslaughter; and if there was no felonious intent or evil design, or culpable neglect, there is no crime and should be no conviction. If you have a reasonable doubt of the guilt of the accused, you must give him the benefit of that doubt and acquit him; if you have any doubt as to the grade of the homicide, it is your duty likewise to give him the benefit of that doubt and find him guilty of the lowest

grade, if you find him guilty at all. Flight is not evidence of guilt, or usually is very slight evidence of it.

The jury returned a verdict, finding the defendant guilty of voluntary manslaughter.

Counsel for the defendant then moved the Court to set aside said verdict and award a new trial of said case on the following grounds, to wit:

1. Because the verdict is contrary to evidence; contrary to the weight of evidence; and without evidence to support it.

2. Because the evidence is not sufficient to remove all reasonable doubt of the guilt of the accused.

3. Because the verdict is contrary to the law and the charge of the Court.

4. Because the Court erred in refusing to permit the defendant's counsel to prove, by Andrew J. Watters, the sayings of the defendant, made about five minutes after the discharge of the pistol, said counsel stating that they expected to prove by the witness that the defendant had gone about one hundred and fifty yards from the place where the deceased was shot, and in about five minutes thereafter, or it might have been less or more than five minutes, sent for the witness, and upon the witness, going to him, the defendant made the declaration sought to be given in evidence, viz.: that the pistol fired accidentally. Counsel for the State objected to the declaration being given in evidence, on the ground that it did not accompany the act, and was not a part of the *res gestæ*. The Court excluded the declaration, and refused to let the witness testify as to the sayings of the defendant, unless they immediately accompanied his act.

5. Because the Court erred in refusing to permit the defendant's counsel to introduce evidence, showing why the defendant had the pistol on the occasion of the homicide.

6. Because, after the defendant had closed his testimony, W. W. Clark, one of the counsel for the State, handed to the presiding judge a letter, and, at the same time, stated to the Court, in the presence and hearing of the jury, that the letter gave him information of additional evidence in behalf of the State, and asked for time to

Aaron *alias* Bryant vs. The State of Georgia.

send for and have such evidence before the Court; the presiding judge, on examining the letter, remarked that the testimony, if present, would be inadmissible, and the application for time was refused.

The presiding judge, after hearing argument, overruled the motion, and refused the new trial asked for, and the writ of error in this case is prosecuted for the purpose of reversing that decision.

BARTLETT & FLOYD, for the plaintiff in error.

HAMMOND, Solicitor-General, by NAT. J. HAMMOND, CLARK & LAMAR, for the defendant in error.

*By the Court.*—LUMPKIN, J., delivering the opinion.

The defendant, Richard Aaron, was indicted for the murder of James H. Reynolds, and convicted of voluntary manslaughter.

The Court below refused to grant a new trial, and the accused brings his case to this Court by writ of error.

A number of persons had casually met at the store-house of the deceased, and the evidence is—and such no doubt was the fact—that all the parties present were entirely friendly with each other. There was no grudge or ill-will existing between any of them. A game of marbles for a small wager was proposed and accepted, there being two on each side. John Aaron and James Reynolds played against Richard Aaron and James Aaron. During the second game, an altercation sprang up between *John* and *James Aaron,* about *vents* and *kicks,* and to prevent a fight between the brothers, Reynolds seized and carried off James Aaron, and Richard Aaron, from behind, grasped the arms of John Aaron and dragged him off. It is not pretended but that up to this time there was not the slightest manifestation of any bad feeling, except as between John and James Aaron, and that Richard Aaron and James Reynolds were acting *bona fide* the part of peacemakers.

Just at this time, John Aaron demanded of Richard Aaron to release him, or he would cut himself loose. He drew his knife from his pocket and opened it; Richard, from behind, relaxed his hold and pushed John forward up the hill, proba-

bly to avoid immediate danger. At first, it was supposed that John intended starting toward James, with whom he had had the difficulty, but he turned suddenly toward Richard, and with his knife drawn, and in a striking attitude, advanced upon him. Richard drew from his pocket one of Colt's repeaters—his latest patent, and a most remarkable weapon it is—still retreating down the hill, and laid it across the palm of his left hand, holding his right thumb upon the hammer; John stopped.

In the meantime, James Reynolds left James Aaron and advanced toward John Aaron, intending likely further to interpose to prevent mischief between John Aaron and Richard. The three stood in a triangular position—Reynolds being within a few feet of John Aaron; the pistol was still in the situation I have represented; it went off and the load was discharged in the breast of James Reynolds, near the collarbone. Reynolds died immediately of the wound.

It is in evidence, that the eyes of Richard and John Aaron were steadily fixed upon each other all the time; and it is quite probable that Richard had not noticed the approach of Reynolds. The trigger of this pistol, when cocked, protrudes slightly through the guard, and the grasp of the barrel—so as to prevent it from revolving—or the pressure of the lower or inner side of the left hand, as the pistol was grasped in the palm, will, in the first instance, prevent the pistol from cocking, or in the latter, if cocked, will cause a discharge.

I have not recapitulated all the testimony, nor have I grouped the facts together so favorable for the defendant, as the evidence warrants; and to convey any clear idea of the pistol upon paper, requires more scientific knowledge of gunnery or firearms than I possess; and yet, to understand the real merits of this case, a correct comprehension of the mechanism of this pistol is indispensably necessary.

Now, there is not a suspicion entertained by anybody that the defendant intended to shoot Reynolds. The able counsel, Mr. Lamar, who represents the State, and of whose argument, I may truthfully say, I was at a loss whether to admire it most for its ingeniousness or its ingenuousness, cheerfully concedes this. Did he intend to kill John Aaron? The proof shows he did not. The pistol was not pointed in that direction. It was not held in a position for that purpose.

Aaron *alias* Bryant vs. The State of Georgia.

It was not aimed at John Aaron. John Aaron had ceased to advance upon the accused, and was standing still when the explosion took place. It is most unreasonable to conclude that he shot intentionally at John Aaron. And then, on the other hand, it is so natural to suppose that the shooting was accidental, and any one, acquainted with this weapon, could scarcely doubt upon this subject. The pistol was likely cocked, when placed in the left hand, with the right thumb on the hammer, to prevent its going off, and it was the involuntary pressure of the lower or inner side of the left hand against the trigger, that produced the accident.

As to voluntary manslaughter, it is wholly inconsistent with the circumstances of this case, and we think the Court was wrong in charging the jury—although it is not made a ground of complaint in the motion for a new trial—"That, if John Aaron was attempting to commit a serious personal injury upon the defendant, and the defendant, under a sudden, violent impulse of passion, had killed him; in such a case it would be voluntary manslaughter."

If John Aaron was attempting to commit a felony upon Richard Aaron, Richard Aaron, with or without passion, must have been justifiable in killing John Aaron.

But there is not a particle of proof in the record to justify the hypothesis that Richard Aaron was actuated by any sudden, violent impulse of passion. Never was a man more cool, collected and courageous. Having drawn his pistol, and perhaps, cocked it, he placed it in the palm of his left hand, and calmly, and apparently dispassionately, waited the result. He eyed John closely and intently all the time, to determine whether John would force upon him the necessity of taking John's life to save his own, or to protect himself from some serious bodily hurt. Never was conduct more deliberate and self-possessed. Had he been influenced by fear or passion, the demonstration would have been very different. And just when the emergency had apparently passed away, the pistol, from some casualty or other—the nature of which we shall probably never correctly understand—exploded, while still resting in his left hand.

The only crime, then, of which the defendant could possibly be guilty, was the lowest grade of manslaughter, to wit: involuntary manslaughter in the commission or performance of a lawful act, where there had not been observed necessary discretion or caution.

That it was lawful for Richard Aaron to defend himself at any and every hazard against the assault which was threatened by John Aaron, there can be no doubt. And for myself, I must say, in all candor, that I am at a loss to perceive how, situated as he was, any greater degree of discretion or caution could have been used than was manifested by him on this occasion.

If Richard Aaron is to be punished for his want of due care and circumspection in the perilous position in which he was placed, why should those escape who accidentally shoot each other, or their families, in handling or using firearms?

I believe it would be a perversion of the criminal justice of the country, to punish Richard Aaron for that as an offence which was only a misfortune, and which, I doubt not, none regretted more deeply than himself.

Our judgment, therefore, is: That a fair trial should have been granted, because the verdict was strongly and decidedly against the weight of evidence. Moreover, we think, it was error in the Court, not to allow the defendant to explain how he happened to have a pistol on that occasion. If he had been using it in aiding to arrest a felon the overnight, or were in the discharge of the duty of a patrol, or for any other lawful purpose, it was right to permit him to prove it. Here, according to the case made by the record, it could not affect the result one way or another. Had there been a probable case of murder made out, it might have become very material to make this proof.

We see no other errors in the bill of exceptions which require correction by this Court.

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court, that the judgment of the Court below be reversed upon the ground, first, that the Court erred in not permitting the defendant to show why he had the pistol on the day the homicide took place; second, because the verdict was strongly and decidedly against the weight of evidence.