# BROWN v. COLLINS.

A person whose horses, frightened by a locomotive, became uncontrollable, ran away with him, went upon land of another, and broke a post there, is not liable for the damage if it was not caused by any fault on his part.

TRESPASS, by Albert H. Brown against Lester Collins, to recover the value of a stone post on which was a street lamp, situated in front of his place of business in the village of Tilton. The post stood upon the plaintiff's land, but near the southerly line of the main highway lead- ing through the village and within four feet of said line. There was nothing to indicate the line of the highway, nor any fence or other obstruction between the highway, as travelled, and the post. The highway crosses the railroad near the place of accident, and the stone post stood about fifty feet from the railroad track at the crossing. The defendant was in the highway, at or near the railroad crossing, with a pair of horses loaded with grain, going to the grist-mill in Til- ton village. The horses became frightened by an engine on the rail- road near the crossing, and by reason thereof became unmanageable, and ran, striking the post with the end of the pole and breaking it off near the ground, destroying the lamp with the post. No other injury was done by the accident. The shock produced by the collision with the post threw the defendant from his seat in the wagon, and he struck on the ground between the horses, but suffered no injury except a slight concussion. The defendant was in the use of ordinary care and skill in managing his team, until they became frightened as aforesaid.

The foregoing facts were agreed upon for the purpose of raising the question of the right of the plaintiff to recover in this action.

*Rogers,* for the plaintiff.

*Barnard & Sanborn,* for the defendant.

DOE, J. It is agreed that the defendant was in the use of ordinary care and skill in managing his horses, until they were frightened; a

that they then became unmanageable, and ran against and brok past on the plaintiff's land. It is not explicitly stated that the defen- ant was without actual fault,—that he was not guilty of any malice or unreasonable unsk'lfulness or negligence; but it is to be inferred that the fact was so : and we decide the case on that ground. We take the case as one where, without actual fault in the defendant, his horses broke from his control, ran away with him, went upon the plaintiff's land, and did damage there, against the will, intent, and desire of the defendant.

Sir Thomas Raymond's report of *Lambert & Olliot* v. *Bessey* (T Raym. 421) and *Bessey* v. *Olliot & Lambert* (T. Raym. 467) is, "Th question was this : A gaoler takes from the bailiff a prisoner arrested by him out of the bailiff's jurisdiction, Whether the gaoler be liable to an action of false imprisonment? and the judges of the common pleas did all hold that he was; and of that opinion I am, for these reasons.

"1. In all civil acts, the law doth not so much regard the intent the actor, as the loss and damage of the party suffering; and th fore Mich. 6 *E.* 4. 7. *a. pl. 18.* *Trespass quare vi & armis clau fregit, & herbam suam pedibus calcando consumpsit* in six acres. T defendant pleads that he hath an acre lying next the said six acr and upon it a hedge of thorns, and he cut the thorns, and they, *i invito*, fell upon the plaintiff's land, and the defendant took them as soon as he could, which is the same trespass; and the plaintiff murred; and adjudged for the plaintiff; for though a man doth a la ful thing, yet, if any damage do thereby befall another, he shall answ for it, if he could have avoided it. As if a man lop a tree, and th boughs fall upon another, *ipso invito*, yet an action lies. If a m shoot at buts, and hurt another unawares, an action lies. I have la through which a river runs to your mill, and I lop the fallows growi upon the river side, which accidentally stop the water, so as your m is hindered, an action lies. If I am building my own house, and piece of timber falls on my neighbor's house, and breaks part of it an action lies. If a man assault me, and I lift up my staff to defend myself, and, in lifting it up, hit another, an action lies by that person and yet I did a lawful thing. And the reason of all these cases because he that is damaged ought to be recompensed. But otherw it is in criminal cases, for there *actus non facit reum nisi mens sit rea*.

"Mich. 23. Car. 1. B. R.—Stile 72. *Guilbert* versus *Slone.* Trespass for entering his close, and taking away his horse. The defendant plea that he, for fear of his life, by threats of twelve men, went into the plaintiff's house, and took the horse. The plaintiff demurred; and adjudged for the plaintiff, because threats could not excuse the defend ant, and make satisfaction to the plaintiff.

"F b. 134, *Weaver* versus W Trespass of assault and battery. The def ant pleads, that he was ined soldier in London, and he and the aintiff were skirmishing with their company, and the defendant, with is musket, *casualit.r, & per infortunium & contra voluntatem suam* in discharging of his gun hurt the plaintiff; and resolved no good plea.

So here, though the defendant knew not of the wrongful taking of plaintiff, yet that will not make any recompense for the wrong plaintiff hath sustained. * * But the three other judges resolv that the defendant, the gaoler, could not be charged, because he co not have notice whether the prisoner was legally arrested or not."

In *Fletcher* v. *Rylands** (L. R. 3 H. L. 330), Lord CRANWORTH said " In considering whether a defendant is liable to a plaintiff for dam which the plaintiff may have sustained, the question in general is whether the defendant has acted with due care and caution, but whet is acts have occasioned the damage. This is all well explained ic old case of *Lambert* v. *Bessey*, reported by Sir Thomas Raym( Sir T. Raym. 421). And the doctrine is founded on good sense. when one person, in managing his own affairs, causes, however in cently, damage to another, it is obviously only just that he should the party to suffer."

The head-note of *Weaver* v. *Ward*, Hob. 134, is,—" If one trai soldier wound another, in skirmishing for exercise, an action of t pass will lie, unless it shall appear from the defendant's plea that was guilty of no negligence, and that the injury was inevitable." reason of the decision, as reported, was this : " For though it w greed, that if men tilt or tourney in the presence of the king, o wo masters of defence playing their prizes kill one another, that t shall be no felony ; or if a lunatic kill a man, or the like ; beca felony must be done *animo felonico ;* yet in trespass, which tends o to give damages according to hurt or loss, it is not so; and theref if a lunatic hurt a man, he shall be answerable in trespass ; and the fore no man shall be excused of a trespass (for this is the nature use, and not of a justification, *prout ei bene licuit),* excep may be judged utterly without his fault ; as if a man by force t my hand and strike you ; or if here the defendant had said that plaintiff ran cross his piece when it was discharging; or had set fo the case : with the circumstances, so as it had appeared to the cc that it had been inevitable, and that the defendant had committed negligence to give occasion to the hurt."

There may be some ground to argue that " utterly without his fau " inevitable," and " no negligence," in the sense intended in that c mean no more than the modern phrase " ordinary and reasonable c and prudence ; " and that, in such a case, at the present time, to h a plea good that alleges the exercise of reasonable care, without ting forth all " the circumstances " or evidence sustaining the p. would be substantially in compliance with the law of that case, ( allowance being made for the difference of legal language used at ferent periods, and the difference in the forms of pleading. But drift of the ancient English authorities on the law of torts see differ materially from the view now prevailing in this country.

*See *Cahill* v. *Eastman*, 18 Minn. 324, *Madras R. Co.* v. *Zemindar of Carvetinag* decided July 3, 1874, 30 L. Times Rep. (N. S.) 770. REPORT

... ly, in England, there seems to have been no well-defined test of any reasonable tort. Defendants were often held liable " because," as Hammond says, " he that is damaged ought to be recompensed ; " and not because, upon some clearly stated principle of law founded on actual culpability, public policy, or natural justice, he was entitled to compensation from the defendant. The law was supposed to regard " the loss and damage of the party suffering," more than the negligence and blameworthiness of the defendant : but how much more it regarded the former than the latter, was a question not settled, and very little investigated. " The loss and damage of the party suffering," if without relief, would be a hardship to him ; relief compulsorily furnished by the other party would often be a hardship to him : when and why the " loss and damage " should, and when and why they should not, be transferred from one to the other, by process of law, were problems not solved in a philosophical manner. There were precedents, established upon superficial, crude, and undigested notions ; but no application of the general system of legal reason to this subject.

Mr. Holmes says,—" It may safely be stated that all the more ancient examples are traceable to conceptions of a much ruder sort (than actual fault), and in modern times to more or less definitely thought-out views of public policy. The old writs in trespass did not allege, nor was it necessary to show, anything savoring of culpability. It was enough that a certain event had happened, and it was not even necessary that the act should be done intentionally, though innocently. An accidental blow was as good a cause of action as an intentional one. On the other hand, when, as in *Rylands* v. *Fletcher*, modern courts hold a man liable for the escape of water from a reservoir which he has built upon his land, or for the escape of cattle, although he is not alleged to have been negligent, they do not proceed upon the ground that there is an element of culpability in making such a reservoir, or in keeping cattle, sufficient to charge the defendant as soon as a *damnum* occurs, but on the principle that it is politic to make those who go into extra-hazardous employments take the risk on their own shoulders." He alludes to the fact that " there is no certainty what will be thought extra-hazardous in a certain jurisdiction at a certain time," but suggests that many particular instances point to the general principle of liability for the consequences of extra-hazardous undertakings as the tacitly assumed ground of decision. 7 Am. Law Rev. 652, 653, 662 ; 2 Kent Com. (12th ed.) 561, *n.* 1 ; 4 *id.* 110, *n.* 1. If the hazardous nature of things or of acts is adopted as the test, or one of the tests, and the English authorities are taken as the standard of what is to be regarded as hazardous, " it will be necessary to go the length of saying that an owner of real property is liable for all damage resulting to his neighbor's property from anything done upon his own land " (Mellish's argument in *Fletcher* v. *Rylands*, L. R. 1 Ex. 272), and that an individual is answerable " who, for his own benefit, makes an improvement on his own land, according to his best skill and diligence, and in foreseeing it will produce any injury to his neighbor, if he thereby—

unwittingly injure his neighbor "—GIBBS, C. J., in *Sutton* v. *Clarke*, 6 Taunt. 44, approved by BLACKBURN, J., in *Fletcher* v. *Rylands*, L. R. 1 Ex. 286. If danger is adopted as a test, and the English authorities are abandoned, the fact of danger, controverted in each case, will present a question for the jury, and expand the issue of tort or no tort, into a question of reasonableness in a form much broader than has been generally used; or courts will be left to devise tests of peril, and varying influences of time and place that may not immediately produce a uniform, consistent, and permanent rule.

It would seem that some of the early English decisions were based "view as narrow as that which regards nothing but the hardship of the party suffering;" disregards the question whether, by transferring the hardship to the other party, anything more will be done in substitute one suffering party for another; and does not consider what legal reason can be given for relieving the party who has suffered, by making another suffer the expense of his relief. For some of those decisions, better reasons may now be given than were thought of when the decisions were announced: but whether a satisfactory test of an actionable tort can be extracted from the ancient authorities, and whether the few modern cases that carry out the doctrine of those authorities as far as it is carried in *Fletcher* v. *Rylands*—3 H. & C. 774; L. R. 1 Ex. 265; L. R. 3 H. L. 330; L. R. (Phil. ed.) 5 Ex. 552—can be sustained, is very doubtful. The current of American authority is very strongly against some of the leading English cases.

One of the strongest presentations of the extreme English view is by BLACKBURN, J., who says, in *Fletcher* v. *Rylands* (L. R. 1 Ex. 279, 280, 281, 282),—" We think that the true rule of law is, that the person who for his own purposes brings on his lands, and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its escape. He can excuse himself by showing that the escape was owing to the plaintiff's default; or perhaps that the escape was the consequence of *vis major*, or the act of God; but as nothing of this sort exists here, it is unnecessary to inquire what excuse would be sufficient. The general rule, as above stated, seems, on principle, just. The person whose grass or corn is eaten down by the escaping cattle of his neighbour, or whose mine is flooded by the water from his neighbour's reservoir, or whose cellar is invaded by the filth of his neighbour's privy, or whose habitation is made unhealthy by the fumes and noisome vapors of his neighbour's alkali works, is damnified without any fault of his own; and it seems but reasonable and just that the neighbour, who has brought something on his own property which was not naturally there, harmless though it was so long as it is confined to his own property, but which he knows to be mischievous if it gets on his neighbour's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property. But for his act in bringing it there no mischief could have accrued, and it seems but just that he should, at his own peril, keep

it here so that no mischief may accrue, or answer for the natural anticipated consequences. And upon authority, this we think is established to be the law, whether the things so brought be bei water, or filth, or stenches. The case that has most commonly be cited, and which is most frequently to be found in the books, is as to obligation of the owner of cattle which he has brought on his land, to prevent their escaping and doing mischief. The law, as to them, seems to be perfectly settled from early times: the owner must keep them at his peril, or he will be answerable for the natural consequences of escape,—that is with regard to tame beasts, for the grass they trample upon, though not for any injury to the person of others; n our ancestors have settled that it is not the general nature of her to kick, or bulls to gore (or he might have added, dogs to bite),— if the owner knows that the beast has a vicious propensity to n n, he will be answerable for that too. * * In these latter an (relating to animals called mischievous or ferocious), the p r consideration was damage to the person; and what was decided , that where it was known that hurt to the person was the natural sequence of the animal being loose, the owner should be responsible in damages for such hurt, though where it was not known so be so, the owner was not responsible for such damages; but where the damage is, like eating grass or other ordinary ingredients in damages sant, the natural consequence of the escape, the rule as to keeping in the animal is the same. * * There does not appear to be any difference, in principle, between the extent of the duty cast on him w brings cattle on his land to keep them in, and the extent of the duty imposed on him who brings on his land water, filth, or stenches, other thing, which will, if it escape, naturally do damage, their escaping and injuring his neighbour."

his seems to be substantially an adoption of the early authorities an an extension of the ancient practice of holding the defendant in some cases, on the partial view that regarded the misfortune intiff upon whom a damage had fallen, and required no legal transferring the damage to the defendant. The ancient rule that a person in whose house, or on whose land, a fire accide ly originated, which spread to his neighbor's property and destro ust make good the loss. *Filliter* v. *Phippard,* 11 A. & E. (N. S. 4; *Tubervil* v. *Stamp,* 1 Comyns 32—S. C., 1 Salk. 13; Com. *Action upon the case for Negligence* (A 6.); 1 Arch. N. P. 539; *Flet* v. *lands,* 3 H. & C. 790, 793; *Russell* v. *Fabyan,* 34 N. H. 21 inquiry was made into the reason of putting upon him his neigh s as well as his own. The rule of such cases is applied, by RN, to everything which a man brings on his land, which wil e, naturally do damage. One result of such a doctrine i er) one building a fire on his own hearth, for necessary pur th the utmost care, does so at the peril, not only of losing h use, but of being irretrievably ruined if a spark from his cl arts conflagration which lays waste the neighborhood. "In c

; th. the rule, as laid down in the English cases, is a class of cases 
... to damage from fire communicated from the adjoining pr 
cs. Fire, like water or steam, is likely to produce mischief if 
ca,es and goes beyond control; and yet it has never been held 
his country that one building a fire upon his own premises can 
made liable if it escapes upon his neighbor's premises, and does 
... e without proof of negligence." *Losee* v. *Buchanan*, 51 N. 
... 87.•

Everything that a man can bring on his land is capable of escaping,— 
against his will, and without his fault, with or without assistance, in 
one form, solid, liquid, or gaseous, changed or unchanged by the 
transforming processes of nature or art,—and of doing damage after its 
cape. Moreover, if there is a legal principle that makes a man liable 
r the natural consequences of the escape of things which he brings 
; his land, the application of such a principle cannot be limited to 
bse things: it must be applied to all his acts that disturb the origi-nal 
ler of creation; or, at least, to all things which he undertakl to 
-ssess or control anywhere, and which were not used and enjoy in 
ial is called the natural or primitive condition of mankind, whatever 
at may have been. This is going back a long way for a standard of 
ral rights, and adopting an arbitrary test of responsibility that 
ands all degrees of danger, pays no heed to the essential element of 
tual fault, puts a clog upon natural and reasonably necessary use 
etter and tends to embarrass and obstruct much of the work wl 
seems to be man's duty carefully to do. The distinction made 
ord CAIRNS—*Rylands* v. *Fletcher*, L. R. 3 H. L. 330—between a na 
and a non-natural use of land, if he meant anything more than 
ference between a reasonable use and an unreasonable one, is 
abli.hed in the law. Even if the arbitrary test were applied only 
ings which a man brings on his land, it would still recognize the 
culiar rights of savage life in a wilderness, ignore the rights gro ng 
t of a civilized state of society, and make a distinction not warra cd 
the enlightened spirit of the common law: it would impose a penalty 
on efforts, made in a reasonable, skilful, and careful manner, to rise 
ove a condition of barbarism. It is impossible that legal princi le 
u t. ow so serious an obstacle in the way of progress and impro e-
ent. Natural rights are, in general, legal rights; and the rights of 
vilization are, in a legal sense, as natural as any others. "Most 
e rights of property, as well as of person, in the social state, are 
solute but relative"—*Losee* v. *Buchanan*, 51 N. Y. 485; and, if n 
or were in any other than the social state, it is neither necessary 
pedient that they should now govern themselves on the theory that 
ey ought to live in some other state. The common law does not 
ually establish tests of responsibility on any other basis than 
opriety of their living in the social state, and the relative and qu.lif 
aracter of the rights incident to that state.

In *Fletcher* v. *Rylands*—L. R. 1 Ex. 286, 287—Mr. Justice BLA 
RN, commenting upon the remark of Mr. Baron MARTIN, "that, wh

damage is done to personal pro        even to the person, by collision,
either upon land or at sea, the:    be negligence in the party doing
the damage to render him legally responsible," says,—" This is no
doubt true; and, as was pointed out by Mr. Mellish during his argu-
ment before us, this is not confined to cases of collision, for there are
many cases in which proof of negligence is essential, as for instance,
where an unruly horse gets on the footpath of a public street and kill
a passenger—*Hammack* v. *White*, 11 C. B. N. S. 588, 31 L. J. (C. P.)
129; or where a person in a dock is struck by the falling of a bale of
cotton which the defendant's servants are lowering—*Scott* v. *London
Dock Company*, 3 H. & C. 596, 35 L. J. (Ex.) 17, 220; and many other
similar cases may be found. But we think these cases distinguishable
from the present. Traffic on the highways, whether by land or sea,
cannot be conducted without exposing those whose persons or property
are near it to some inevitable risk; and that being so, those who go
on the highway, or have their property adjacent to it, may well be held
so subject to their taking upon themselves the risk of injury from
inevitable danger; and persons who, by the license of the owner,
come to warehouses where goods are being raised or lowered, cer-
tainly do so subject to the inevitable risk of accident. In neither case,
therefore, can they recover without proof of want of care or skill occa-
sioning the accident; and it is believed that all the cases in which
inevitable accident has been held an excuse for what, *prima facie*, was
a trespass, can be explained on the same principle, viz., that the cir-
cumstances were such as to show that the plaintiff had taken that risk
upon himself." This would be authority for holding, in the present
case, that the plaintiff, by having his post near the street, took upon
himself the risk of its being broken by an inevitable accident carrying
a traveller off the street.× But such a doctrine would open more ques-
tions, and more difficult ones, than it would settle. At what distance
from a highway would an object be near it? What part of London
is not near a street? And then, as the defendant had as good a right
to be at home with his horses as to be in the highway, why might not
his neighbor, by electing to live in an inhabited country, as well be
held to take upon himself the risk of an inevitable accident happening
by reason of the country being inhabited, as to assume a highway risk
by living near a road? If neighborhood is the test, who are a man's
neighbors but the whole human race? If a person, by remaining in
England, is held to take upon himself one class of the inevitable dan-
gers of that country because he could avoid that class by migrating to
a region of solitude, why should he not, for a like reason, also be held
to expose himself voluntarily to other classes of the inevitable dangers
of that country? And where does this reasoning end?

It is not improbable that the rules of liability for damage done by
brutes or by fire, found in the early English cases, were introduced, by
sacerdotal influence, from what was supposed to be the Roman or the
Hebrew law. 7 Am. L. Rev. 652, *note;* 1 Domat Civil Law (Stra-
han's translation, 2d ed.) 304, 305, 306, 312, 313; Exodus xxi: 28–32

36; xxiv: 5, 6, 9. It would not be singular if these rules should be spontaneously produced at a certain period in the life of any community. Where they first appeared is of little consequence in the present inquiry. They were certainly introduced in England at an immature stage of English jurisprudence, and an undeveloped state of agriculture, manufactures, and commerce, when the nation had not settled down to those modern, progressive, industrial pursuits which the spirit of the common law, adapted to all conditions of society, encourages and defends. They were introduced when the development of many of the rational rules now universally recognized as principles of the common law had not been demanded by the growth of intelligence, trade, and productive enterprise,—when the common law had not been set forth in the precedents, as a coherent and logical system on many subjects other than the tenures of real estate. (At all events, whatever may be said of the origin of those rules, to extend them, as they were extended in *Rylands* v. *Fletcher*, seems to us contrary to the analogies and the general principles of the common law, as now established. To extend them to the present case would be contrary to American authority, as well as to our understanding of legal principles.)

The difficulty under which the plaintiff might labor in proving the culpability of the defendant,—which is sometimes given as a reason for imposing an absolute liability without evidence of negligence—*Rixford* v. *Smith*, 52 N. H. 355, 359—or changing the burden of proof—*Lisbon* v. *Lyman*, 49 N. H. 553, 568, 569, 574, 575,—seems not to have been given in the English cases relating to damage done by brutes or fire. And, however large or small the class of cases in which such a difficulty may be the foundation of a rule of law, since the difficulty has been so much reduced by the abolition of witness disabilities,—the present case is not one of that class.

There are many cases where a man is held liable for taking, converting—*C. R. Co.* v. *Foster*, 51 N. H. 490—or destroying property, or doing something else, or causing it to be done, intentionally, under a claim of right, and without any actual fault. "Probably one half of the cases, in which trespass *de bonis asportatis* is maintained, arise from a mere misapprehension of legal rights." METCALF, J., in *Stanley* v. *Gaylord*, 1 Cush. 536, 551. When a defendant erroneously supposed, without any fault of either party, that he had a right to do what he did, and his act, done in the assertion of his supposed right, turns out to have been an interference with the plaintiff's property, he is generally held to have assumed the risk of maintaining the right which he asserted, and the responsibility of the natural consequences of his voluntary act. But when there was no fault on his part, and the damage was not caused by his voluntary and intended act; or by an act of which he knew, or ought to have known, the damage would be a necessary, probable, or natural consequence; or by an act which he knew, or ought to have known, to be unlawful,—we understand the general rule to be, that he is not liable. *Vincent* v. *Stinehour*, 7 Vt. 62; *Aaron* v. *State*, 31 Ga. 167; *Morris* v. *Platt*, 32 Conn. 75; and

Judge REDFIELD's note to that case in 4 Am. L. Reg. (N. S.) 532 ;
Townshend on Slander, secs. 67, 88, p. 128, n. 1 (2d ed.). In Brown v.
Kendall, 6 Cush. 292, the defendant, having interfered to part his dog
and the plaintiff's which were fighting, in raising a stick for that pur-
pose, accidentally struck the plaintiff, and injured him. It was held,
that parting the dogs was a lawful and proper act which the defendant
might do by the use of proper and safe means ; and that if the plain-
tiff's injury was caused by such an act done with due care and all
proper precautions, the defendant was not liable. In the decision,
there is the important suggestion that some of the apparent confusion in
the authorities has arisen from discussions of the question whether a
party's remedy is in trespass or case, and from the statement that when
the injury comes from a direct act, trespass lies, and when the damage
is consequential, case is the proper form of ·action,—the remark con-
cerning the immediate effect of an act being made with reference to
damage for which it is admitted there is a remedy of some kind, and
on the question of the proper remedy, not on the general question of
liability. Judge SHAW, delivering the opinion of the court, said,—" We
think, as the result of all the authorities, the rule is correctly stated
by Mr. Greenleaf, that the plaintiff must come prepared with evidence
to show either that the intention was unlawful, or that the defendant
was in fault ; for if the injury was unavoidable, and the conduct of
the defendant was free from blame, he will not be liable. 2 Greenl.
Ev., secs. 85 to 92 ; Wakeman v. Robinson, 1 Bing. 213. If, in the
prosecution of a lawful act, a casualty purely accidental a·ises, no ac-
tion can be supported for an injury arising therefrom. Davis v.
Saunders, 2 Chit. R. 639 ; Com. Dig. Battery, A. (Day's ed.) and notes ;
Vincent v. Stinehour, 7 Verm. 62 ;" James v. Campbell, 5 C. & P. 372 ;—
Alderson v. Waistell, 1 C . & K. 358.

Whatever may be the rule or the exception, or the reason of it, in
cases of insanity—Weaver v. Ward, Hob. 134 ; Com. Dig. Battery, A.,
note d, Hammond's ed. ; Dormay v. Borradaile, 5 M. G. & S. 380 ;
Sedgwick on Damages 455, 456, 2d ed. ; Morse v. Crawford, 17 Vt.
499 ; Dickinson v. Barber, 9 Mass. 225 ; Krom v. Schoonmaker, 3 Barb.
647 ; Horner v. Marshall, 5 ·Munf. 466 ; Yeates v. Reed, 4 Blackf.
463—and whatever may be the full legal definitions of necessity, in-
evitable danger, and unavoidable accident, the occurrence complained of
in this case was one for which the defendant is not liable, unless every
one is liable for all damage done by superior force overpowering him,
and using him or his property as an instrument of violence. The de-
fendant, being without fault, was as innocent as if the pole of his
wagon had been hurled on the plaintiff's land by a whirlwind, or he
himself, by a stronger man, had been thrown through the plaintiff's
window. Upon the facts stated, taken in the sense in which we un-
derstand them, the defendant is entitled to judgment. 1 Hilliard
on Torts, ch. 3, 3d ed. ; Losee v. Buchanan, 51 N. Y. 476 ; Parrot v.
Wells, 15 Wall. 524, 537 ; Roche v. M. G. L. Co., 5 Wis. 55 ; Eastman
v. Co., 44 N. H. 143, 156.                          Case discharged.